Curtis is under 35 years of age, a minister of religion, of the denomination called i! Primitive Baptist,” authorized to preach according to the rules of his sect; and has been heretofore in the discharge of ministerial duties, in Caldwell, the county of his residence; and exempted from conscription on that ground, In, October last, Curtis agreed to become the substitute of one Foster, in the 10th Reg’t. of Cavalry, army of Virginia; and in execution of that agreement, left home and went as far as Salisbury, 70 miles, where he was arrested as a conscript, and sued out a writ of
 
 habeas corpus.
 

 The question is of great practical importance; on the one hand, if exempts may legitimately become substitutes, a new
 
 *181
 
 source of supply will be opened to those who wish to leave ■the army or keep out of it; on the other, the people at home will be deprived of services necessary for their subsistence and well-being. My duty is simply to expound the law. In its discharge I have been much aided by
 
 Mr.
 
 Graham, who filed a written argument for the petitioner, and
 
 Mr.
 
 Sharpe, who appeared for the Confederate States. After full consideration, I am convinced that the agreement to become a substitute, and
 
 the entering upon the execution of the
 
 agreement, put an end to the exemption, and made Curtis liable to conscription, because he had ceased to be
 
 um
 
 the regular discharge of ministerial duties.”
 

 A perusal of the exemption act will satisfy any one that ^he exemption of editors of newspapers, ministers of religion, physicians, shoemakers, blacksmiths, &c., was made, not for the purpose of conferring a special privilege on individuals, but for the benefit of the people at home, who required the services of physicians, shoemakers, blacksmiths, millers, &c., to' enable them to live, and the services of editors, and ministers of religion, for their intellectual and religious support.— The exemption is restricted to the editor of a newspaper
 
 now beiwg published,
 
 a minister of religion
 
 intkeregular
 
 discharge of ministerial duties, a physician
 
 now in actual
 
 practice, shoemakers, blacksmiths, millers,
 
 &c., actucdl/y employed
 
 at the time
 
 at their
 
 trades. From the words, and the object in view the law implies, that the exemption shall cease when the services cease to be rendered to the public; for the services are the reason and consideration .on which the exemption is based, and when the one ends the other ends, by operation of law, and by force of an implied condition, which “ My Lord Coke” says “ the law tacitly annexes by reason of the object, and the nature of the subject-matter, to prevent the policy of the statute from being defeatdd.” No more striking illustration of the wisdom of this tacit act of the law can be presented than is furnished by the case under consideration. The object of the statute was to keep an army in the field, and at the same time enable the people at home fo support themselves; for this purpose a man is left out of the army to discharge ministerial duties for the people, another to attend them in
 
 *182
 
 sickness, another to make shoes, and another to sharpen their ploughs. Suppose the men left out of the army for these purposes, are tempted by large sums of money to quit their vocations and go into the army as substitutes, the army gets a man and loses one, the people lose the services of one, without any equivalent — the army gains nothing, the people worse, and the individual p>ockets 5,000 or $10,000!!
 
 t
 
 The law would not be true to itself, if it did not
 
 “jpropria vigore,”
 
 prevent such a perversion of its policy.
 

 To meet this view of the subject
 
 Mr. Graham
 
 takes three positions : 1. “ It may be said, that it is for the benefit of the public and not of the individual that the exemption is granted. Be it so ; there is no means provided by the statute of securing the supposed benefit to the public ; that is left to the voluntary rendition of it by the exempt.” lie may, if he chooses, quit his vocation and join the army; certainly he may do so as a volunteer, and there is no reason of policy why he may not do so as a substitute. Or he may migrate to another State ; or run the blockade, and in all such cases, the public loses the services, on account of which he was exempted.
 

 The learned counsel in assuming that “ no means is provided by the statute of securing the supposed benefit to the public,” begs the question, for the liability to conscription of one who quits his vocation is predicated on the condition which the law tacitly annexes for the purpose and
 
 as the means
 
 of securing the benefit to the public. True, a minister of religion, or shoemaker, may quit his vocation and join the army as a volunteer recruit, and the public will lose his services in his vocation ; but the army gains a soldier — has two instead of one; and in this, lies the distinction between that case and one of substitution ; there, the army gains nothing and the public lose. It is also true, a minister of religion or shoemaker, may migrate to another State, and the public lose his services; but ho thereby becomes liable to conscription in the State to which he goes, by force of that same tacit act of the law, and the army gains a soldier; so it is true an exempt may take his chance to run the blockade ; a soldier may likewise desert and run the blockade, and if he escapes, there is no help for it, not from a defect in the law, but becauseit can
 
 *183
 
 not reach him. I will add to the list, a man (may quit his vocation and stay at home, and thus deprive'the public of his services, but by force of this implied condition he becomes liable to conscription, and the army gains a man. These considerations demonstrate, as it seems to me, that such a condition must be implied, otherwise all who are exempted by reason of being actually employed in serving the' public, as soon as the exemption is consummated, may quit their vocations, and go as substitutes for large rewards, or remain at home in idleness or enter into speculation. The condition which the law tacitly annexes effectually guards against all of these evils.
 

 2. “ If forfeitures were contemplated, undertaking service as a substitute soldier is not one of them ; it is not a forfeiture for non-user. See 2 Blaekstone, 153.
 

 The duties of a soldier or officer and a minister of religion, are not incompatble.
 
 Mr. Graham
 
 refers to the instance of the Pev. Dr. Hall, who, in the revolution was a Captain of a company and Chaplain to a regiment,
 
 “
 
 fighting or preaching, as occasion offered.” — Foote’s Notes N. C. Bishop and Lieut. Gen. Polk, Oapt. Pendleton and others. In such cases, the church to which an individual belongs, if they disapprove such conduct in a minister, may visit him with its penalties of deprivation, &c., but it is not perceived how the
 
 lay
 
 authorities, either military or civil, shall ascertain and declare that a minister of religion has ceased to be a minister and subject him to forfeitures and penalties therefor ; it is an ecclesiastical question affecting one’s right “ to worship God according to the dictates of his own conscience,” with which, government is forbidden to interfere.
 

 The learned council has fallen into error, in supposing that the exemption is annexed to
 
 the, office
 
 of a minister of religion, and that the implied condition involves a forfeiture of the office, so as to call for a sentence of deprivation; whereas, it has no more concern with the question, whether the individual continues to be a minister of religion, than whether one continues to be a physician, or a shoemaker. The exemption is annexed to the services of the individual, so that when a minister of religion ceases to be
 
 in the regular
 
 discharge of ministerial duties, or a physician ceases to practice, or a shoe
 
 *184
 
 maker to make shoes for the public, the exemption ceases, notwithstanding he may still be a minister of religion, a physician, or a shoemaker by trade. How it would be in the case of a Judge or a member of the Legislature, and others, holding
 
 public offices,
 
 (where it may be, the exemption is annexed to the office,) should any of such officers become substitutes, and whether a'judgment of forfeiture would be necessary before they become liable to conscription, is a question into which I will not enter, for, it is certain that in case ■of a
 
 prvoate office
 
 as a minister of religion, or a profession of a physician, or the trade of a shoemaker and the like, no deprivation of the profession, office or trade is involved, and they may take it up again, as soon as the war is over, or they are allowed to leave the army ; the point is, that supposing them to continue to be ministers of religion, physicians or shoemakers, they have ceased to serve the public in their vocations. So, likewise, the question of “ incompatibility,” is not involved, for admit a minister of religion, who is a soldier, may preach when his officers permit him, still he is not
 
 in the regular
 
 discharge of ministerial duties ; so a physician, while in ■camp, may administer a dose of medicine, still he is not in the actual practice of his profession, or a shoemaker may mend or make a pair of shoes, or a blacksmith maj7 shoe a horse, still they are not actually employed in serving the public in their trades. In other words, although such soldiers may be at times useful in that way, it is not their regular business.
 

 3. “ A forfeiture of exemption cannot be incurred until some act is done, which binds the exempt to duty — that is, until he signs the articles of enlistment and is sworn into service — until that is done, he has his
 
 locusgpenitentice,
 
 and may refuse to fulfill the contract and return to his flockin the county of his residence. A forfeiture wbuld surely not be enforced merely upon a declaration of intention to enlist in conversation, or upon an executory agreement to that effect.”
 

 It may be conceded that an
 
 agreement
 
 to become a substitute, the man still continuing in the regular discharge of ministerial duties, would not cause his exemption to cease ; but our question is, after making the agreement, he enters upon its
 
 execution,
 
 to wit: leaves home, starts to the army, and
 
 *185
 
 goes YO miles on his way, is that an act by which he ceases to be in the regular discharge of ministerial duties ? That is the question. It certainly will not do to allow the door to be left open for the
 
 loowspenitential,
 
 until the man is actually received as a substitute, and the principal is discharged; for, if so, the time to enforce the implied condition will be past; he cannot be made a conscript after he has been received as a substitute. There must, consequently, be some intermediate stage at. which the exemption ceases, and he becomes liable as a conscript. My conclusion is, that stage is, when, a'f-ter making an agreement, he does some act in part execution of it, showing, unequivocally, a purpose to abandon his former vocation and cease to render to the public the services, in consideration of which he had been exempted. The act of leaving home, starting to the army, and going 70 miles on his way, is one of that character.
 

 Whether, if Ourtis had been allowed to execute his agreement fully and been received as a substitute, the substitution would not have been void, on the ground, that he had, himself, become liable to military duty, is a question which suggests itself, but need not be determined. I suppose, however, if he did not become liable, as a conscript, until the thing was done, that is, until he signs the articles of enlistment and is sworn into service, the substitution would be valid. If so, it furnishes an additional reason for having some intermediate stage in order to give-effect to the law, and prevent the condition from being nugatory.
 

 It is considered that Samuel Curtis be remanded, and that he pay the cost of this proceeding, to be taxed by the clerk of the Superior Court of Burke county, who will issue an execution if necessary.
 

 The clerk will file the papers in his office and give copy.
 

 B. M. PEAESON, C. J. S. C.
 

 Bichmond Hill, Nov. 10, 1863.